RECEIVED
IN MONROE, LA

FEB 25 2008

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| GLORIA B. BARFIELD | CIVIL ACTION NO. 05-2218 |
| VERSUS | JUDGE ROBERT G. JAMES |
| STATE OF LOUISIANA, ET AL. | MAG. JUDGE KAREN L. HAYES |

RULING

Pending before the Court is a Motion for Summary Judgment [Doc. No. 17] filed by Defendants the State of Louisiana through the Louisiana Department of Justice ("LDOJ"); Charles C. Foti ("Foti"), former Attorney General for the State of Louisiana; and Kristen Widmer de la Bretonne ("Widmer"), an investigator for the LDOJ. Defendants move the Court for summary judgment on Plaintiff Gloria B. Barfield's ("Barfield's") federal claims under 42 U.S.C. § 1983 and her state law claim of false imprisonment.[1] Barfield opposes the motion.

I. FACTS AND PROCEDURAL HISTORY

In 1976, Barfield began employment with G.B. Cooley Hospital for Retarded Citizens in West Monroe, Louisiana ("G.B. Cooley") as a bookkeeper. After several promotions, in 2003, she became the Chief Executive Officer ("C.E.O.") for G.B. Cooley.

At the time of Barfield's promotion, one of the long-time residents at G.B. Cooley was

---

[1] Barfield asserts additional state law claims against Widmer of negligence, gross negligence, defamation, invasion of privacy, intentional infliction of emotional distress, as well as claims under Article 1, §§ 2 & 5 of the Louisiana Constitution. [Doc. No. ¶¶ 42-43]. Defendants do not move for summary judgment on these claims.

1

J.W., a thirty-three-year old man with severe mental retardation, schizophrenia, and seizure disorder. In September 2003, J.W., who had lived at G. B. Cooley for fifteen (15) years, was transferred from a cottage on the main campus to an off-campus community home in a less-restrictive environment.[2] The Admissions Team at G.B. Cooley, comprised of professionals hired to assess patient needs, made the decision to transfer J.W.[3]

Unfortunately, while residing at the community home, J.W. had several violent incidents.[4] Because of his difficulty adjusting, in October 2003, the Admissions Team moved J.W. back to G.B. Cooley's main campus for a few days. However, the Admissions Team determined that transfer of J.W. back to the community home was appropriate with one-on-one supervision.

Patients at G.B. Cooley are also monitored by an Interdisciplinary Team, comprised of both professionals and the patient's family members. This team, including two of J.W.'s aunts, met on October 20, 2003, and agreed to J.W.'s transfer back to the community home.

On November 25, 2003, Barfield met with G.B. Cooley department managers at a

---

[2] The main campus consists of several campus homes or cottages in close proximity to each other, as well as several administration buildings. Off-campus community homes are residential homes in the Monroe/West Monroe area.

[3] Defendants submit as an undisputed issue of fact that J.W.'s transfer "occurred over the strong objection of [G.B.] Cooley's staff, but at the direction of Barfield." This fact is disputed. Barfield contends that the decision was made by the Admissions Team, not by her. Likewise, Barfield disputes Defendants' contention that she "refused to return [J.W.] to [G.B.] Cooley." Rather, she contends that the Admissions Team and Interdisciplinary Team made these decisions about his transfer to and from the community home.

What cannot be disputed, as discussed more fully below, is that Widmer was told these alleged facts by certain G.B. Cooley employees.

[4] J.W. attempted suicide, attempted to jump from a moving van, stabbed himself in the abdomen with a knife and a fork, broke windows, and broke into a neighbor's home, resulting in the neighbor drawing a gun on J.W.

2

Management Team Meeting (a team separate from the Admissions Team and the Interdisciplinary Team). J.W.'s behavior and the need for one-on-one supervision was discussed, according to the minutes from that meeting.

On December 2, 2003, Barfield again met with department managers at a Management Team Meeting. J.W.'s need for one-on-one supervision was again discussed, and, particularly, the financial aspects of such supervision. Barfield determined that she would proceed with the request for special funding.

On January 14, 2004, the Interdisciplinary Team met to discuss J.W. The Team determined that J.W. needed to be in a restricted environment, that this request would be submitted, and that his environment at the community home would be restructured in the meantime.

On January 21, 2004, the Interdisciplinary Team had a special issue meeting about J.W.'s placement. Barfield attended this meeting where it was decided that J.W. would be transferred back to G.B. Cooley's main campus on January 30, 2004.

After receiving a complaint, the Louisiana Department of Health and Hospitals ("LDHH") conducted a survey of G.B. Cooley to determine if it was in compliance with federal and state standards. On September 2, 2004, the LDHH completed its survey. Although the survey did not focus solely on the care of J.W., LDHH determined that G.B. Cooley failed to meet one of the Louisiana Medicaid Program's conditions of participation, "Client Protections," by placing J.W. in an unsafe environment, not providing sufficient staff, and not taking corrective action in a timely manner.

On the date the survey was completed, Barfield signed an "Exit Conference

3

Acknowledgment Statement," affirming that she had been given an opportunity to provide additional information about the alleged deficiencies and that she had received the "Statement of Deficiencies."

Shortly after the completion of the survey, the LDHH provided its report to the Louisiana Medicaid Fraud Control Unit ("MFCU") of the LDOJ. The MFCU assigned Widmer, a Special Agent since 2001, to investigate the possible abuse and/or neglect of J.W. Widmer did not know Barfield.

Widmer (1) reviewed the DHH survey; (2) reviewed J.W.'s medical records; (3) interviewed witnesses, including G.B. Cooley employees; (4) reviewed her findings with her supervisors, two assistant Attorney Generals who are experienced prosecutors; (5) prepared arrest and search warrants; and (6) presented the warrants to Judge Carl Sharp, Fourth Judicial District Court, Parish of Ouachita, State of Louisiana.

Judge Sharp signed the warrants.

In November 2004, Barfield was arrested pursuant to the warrant[5] and charged with cruelty to the infirm, La. Rev. Stat. 14:93.3, and criminal negligence, La. Rev. Stat. 14:12.

However, on June 8, 2005, after conducting its own investigation, the Ouachita Parish District Attorney's Office declined to pursue the charges against Barfield.

On November 8, 2005, Barfield filed this action in the Fourth Judicial District Court, Parish of Ouachita, State of Louisiana. Defendants removed the case to this Court on December 22, 2005.

---

[5] Five other employees of G.B. Cooley were also arrested as a result of Widmer's investigation.

4

On June 18, 2007, Defendants filed the pending motion for summary judgment on Barfield's § 1983 claims and her state law claim of false imprisonment.

After extensions of time for limited discovery, Barfield filed an opposition memorandum on September 14, 2007. [Doc. No. 39].

Defendants filed a reply memorandum on October 12, 2007. [Doc. No. 44].

After extensions of time to permit further discovery, on January 2, 2008, Barfield filed a sur-reply memorandum. [Doc. No. 53].

On January 4, 2008, Defendants filed a sur-sur-reply memorandum. [Doc. No. 57].

Briefing is now complete, and the Court is prepared to rule.

## II.  LAW AND ANALYSIS

### A.  Motions for Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. Topalian v. Ehrmann, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. Id. The moving party cannot satisfy its initial burden simply by setting forth conclusory statements that the nonmoving party has no

5

evidence to prove its case. <u>Ashe v. Corley</u>, 992 F.2d 540, 543 (5th Cir. 1993).

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. <u>Norman v. Apache Corp.</u>, 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. <u>Anderson</u>, 477 U.S. at 255.

### B.  Section 1983 Claim Against Widmer in Her Individual Capacity

Barfield asserts claims against Widmer in her individual capacity under 42 U.S.C. § 1983 for a violation of her Fourth Amendment[6] right to be free from unlawful or illegal arrest.

Section 1983 provides individuals with a civil remedy for the violation of constitutional rights. To establish a § 1983 violation, the plaintiff must show that a person has deprived her of a federal constitutional or statutory right acting under color of state law. <u>Gomez v. Toledo</u>, 446

---

[6]Barfield alleges violations of the Fourth and Fourteenth Amendments to the United States Constitution, but her allegations are properly analyzed only under the Fourth Amendment. See <u>Blackwell v. Barton</u>, 34 F.3d 298, 302 (5th Cir. 1994) ("We hold that Blackwell's section 1983 claim against Barton for illegal arrest and detention is properly considered under the Fourth Amendment, the more specific constitutional right implicated by her allegations."); <u>see also</u> <u>Baker v. McCollan</u>, 443 U.S. 137, 142 (1979) ("By virtue of its 'incorporation' into the Fourteenth Amendment, the Fourth Amendment requires the States to provide a fair and reliable determination of probable cause.")

To the extent that Defendants have moved for summary judgment on Barfield's Fourteenth Amendment claims, their motion is unnecessary because all of Barfield's constitutional claims are brought under § 1983. The issue is whether she has presented a genuine issue of material fact for trial based on **any** constitutional deprivation actionable under § 1983.

6

U.S. 635, 640 (1980).

"Police officers, like other public officials acting within the scope of their official duties, are shielded from claims of civil liability, including § 1983 claims, by qualified immunity." Morris v. Dillard Department Stores, Inc., 277 F.3d 743, 753 (5th Cir. 2001). In reviewing a police officer or public official's claim of qualified immunity, the Supreme Court instructs that the court must engage in a two-step inquiry. The court must first address the constitutional issue: whether the facts alleged, "'[t]aken in the light most favorable to the party asserting injury,'" are sufficient to "'show the officer's conduct violated a constitutional right.'" Brosseau v. Haugen, 543 U.S. 194, 197 (2004) (per curiam) (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). If the plaintiff raises a genuine issue of material fact for trial on the constitutional issue, the court must then address the qualified immunity issue: whether it was clearly established that the officer was violating an individual's constitutional rights. Id. at 199. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier, 533 U.S. at 201.

"This two-part test sits atop a firm policy foundation. Foremost among these policy considerations is the deterrent effect that civil liability may have on the willingness of public officials to fully discharge their professional duties." Sanchez v. Swyden, 139 F.3d 464, 467 (5th Cir. 1998) (citations omitted). However, this policy concern is balanced by "the right of injured persons to receive redress for a violation of their constitutional rights, with the threat of monetary damages operating to deter public officials from violating citizens' constitutional rights." Id. at 468 (citation omitted).

In her memoranda, Barfield contends that Widmer had no factual or legal basis for

7

asserting in an affidavit for Barfield's arrest that she had committed a violation of La. Rev. Stat. 14:93.3, cruelty to the infirm. [Doc. No. 1, ¶ 27]. Barfield argues that Widmer "knowingly misrepresented, by commission and omission, [Barfield's] alleged culpability in the alleged criminally negligent mistreatment of J.W." [Doc. No. 1 ¶ 34]. Specifically, Barfield refers to Widmer's allegedly false statement that J.W.'s transfer was "coordinated by Barfield, and all decisions were finalized by Barfield." [Doc. No. 1, ¶ 28].

Citizens are to be free from an unlawful arrest. See Johnston v. City of Houston, Tex., 14 F.3d 1056, 1061 (5th Cir. 1994) ("[A]n arrest without either a properly issued arrest warrant or probable cause gives rise to a § 1983 claim for relief."). Thus, the Court must determine whether Widmer "had knowledge that would warrant a prudent person's belief that the person arrested had already committed or was committing a crime." Mangieri v. Clifton, 29 F.3d 1012, 1016 (5th Cir. 1994). Even officers who "reasonably but mistakenly conclude that probable cause is present are entitled to qualified immunity." Id. at 1017 (citing Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

Additionally, where, as here, the officer has presented the facts to a judge who then issued the arrest warrant, the Court must also consider the break in the causal chain doctrine.

> It is well settled that if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party. Wheeler v. Cosden Oil and Chemical Co., 744 F.2d 1131, 1132 (5th Cir. 1984); Thomas v. Sams, 734 F.2d 185, 191 (5th Cir. 1984), cert. denied, 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985); Smith v. Gonzales, 670 F.2d 522, 526 (5th Cir. 1982), cert. denied, 459 U.S. 1005, 103 S.Ct. 361, 74 L.Ed.2d 397 (1982); Rodriguez v. Ritchey, 556 F.2d 1185, 1193 (5th Cir. 1977), cert. denied, 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 799 (1978). This Court has held that "an officer who acted with malice in procuring the warrant or the indictment will not be liable if the facts supporting the warrant or indictment are put before an impartial intermediary such as a magistrate or a grand jury, for that intermediary's independent decision breaks the causal chain and insulates the initiating party." Hand v. Gary, 838 F.2d 1420, 1427 (5th Cir.1988) (internal quotations omitted).

8

> The Hand court emphasized that the chain of causation is broken only where all the facts are presented to the grand jury or magistrate **and the malicious motive of the officer does not lead him to withhold any relevant information**. Id. at 1428.

Taylor v. Gregg, 36 F.3d 453, 456-57 (5th Cir. 1994) (emphasis added); see also Shields v. Twiss, 389 F.3d 142, 150 (5th Cir. 2004) ("The causal chain is not broken, however, 'if the plaintiff affirmatively shows that the deliberations of that intermediary were in some way tainted by the actions of the defendants.'") (citing Taylor, 36 F.3d at 456) (additional internal quotation marks omitted). Thus, under this doctrine, Barfield cannot establish a constitutional violation unless Widmer either withheld relevant information from or provided inaccurate information to Judge Sharp, and, Judge Sharp's finding of probable cause was tainted by her reckless or malicious actions. See Smith v. Harris, 134 F.3d 366, 1997 WL 811515, *1 (5th Cir. Dec. 9, 1997) ("An officer who provides false statements in the affidavits supporting an arrest warrant may lose the insulation provided by the magistrate[']s finding of probable cause if the § 1983 plaintiff can show that the false statements tainted the magistrate[']s decision and were made either recklessly or maliciously.") (citations omitted).

The Court's analysis must begin with a review of the criminal statute. Cruelty to the infirm is defined as "the intentional or criminally negligent mistreatment or neglect by any person . . . whereby unjustifiable pain . . . or suffering is caused to the . . . disabled adult, including . . . a person who is a resident of a . . . mental retardation facility." La. Rev. Stat. 14:93.3. To be criminally negligent, a person need not have "specific [or] general criminal intent," but must have "such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." La. Rev. Stat. 14:12.

9

It is undisputed that Widmer did not know Barfield prior to the MFCU's investigation. There are no facts to suggest that Widmer had any malice towards Barfield or had any other motive to procure her arrest. It is also undisputed that Widmer took a number of steps to investigate J.W.'s possible abuse or neglect at G.B. Cooley prior to seeking a warrant for Barfield's arrest. She reviewed the LDHH survey, which included the summary statement of deficiencies, all the deficiencies found, and all supporting documentation. She then wrote a letter to Barfield, requesting all documentation about J.W. and G.B. Cooley's policies and procedures. In return, Widmer received J.W.'s medical records, including "Special Issue Meeting" minutes, physician notes, and progress notes and the job description for the CEO and the CEO Reports. It is undisputed that Widmer reviewed the records provided and that J.W.'s placement was discussed in several meetings attended by Barfield.

Widmer also interviewed several witnesses in this case. She interviewed J.W.'s aunt (who is a member of his Interdisciplinary Team), a former employee of G.B. Cooley, two current employees assigned to G.B. Cooley's Professional Services Department, and one of J.W.'s Qualified Mental Retardation Professions ("QMRPs"). It is undisputed that all witnesses interviewed told Widmer that they had personal knowledge of J.W.'s medical and psychological histories and G.B. Cooley's policies and procedures.

After completing her investigation, Widmer then conferred with two Assistant Attorney Generals, both of whom have extensive prosecutorial experience. With the approval and assistance of an Assistant Attorney General and the MFCU Director, Widmer then prepared the affidavit setting forth Barfield's alleged conduct and presented the affidavit to District Judge Carl Sharp. Judge Sharp read the affidavit in Widmer's presence and then signed the warrant for

arrest.

Barfield did not dispute the facts regarding Widmer's investigation, but contends that Widmer's conduct was "unreasonable." [Doc. No. 39-16, Plaintiff's Statement of Disputed Uncontested Facts, ¶ 6]. In her memoranda, Barfield argues that Widmer "ignored and withheld exculpatory evidence which would have negated a finding of probable cause." [Doc. No. 39, p. 1]. Barfield cites the following as evidence that Widmer provided Judge Sharp with false statements in her affidavit and also withheld exculpatory evidence from her affidavit:

- Widmer falsely stated that Barfield "coordinated" J.W.'s transfer to a community home and that "all decisions" regarding J.W.'s transfer were "finalized" by Barfield.

- Widmer received G.B. Cooley's Policy #8, placing the responsibility of transfers on the Admissions Team.

- Widmer failed to explain that Barfield was not on the Admissions Team.

- Widmer failed to explain that she found documentary evidence and supporting testimony that Barfield had been told by staff that J.W. was receiving one-on-one supervision and was not aware until January 2004 that he was not.

- Widmer ignored her duty to fully investigate because she failed to interview the chairperson of the Admissions Team, Bobbie Caldwell ("Caldwell"), who denies that Barfield influenced the Admissions Team's decision.

- Widmer ignored exculpatory evidence provided by J.W.'s Qualified Mental Retardation Professional ("QMRP"), Florence Fields ("Fields"), a fourteen-year employee of G.B. Cooley, who testified that she told Widmer that the Admissions Team made the decision to transfer J.W.

- Widmer failed to state the standard of care and what constitutes a gross deviation from that standard.

In its reply memorandum, however, Defendants respond that Widmer's investigation revealed that the written policy on transfers was not always followed, and, therefore, relied on her interviews with employees who were familiar with the actual process and what actually occurred

11

with regard to J.W.

Defendants also point out that the deposition testimony of Caldwell, Fields, and another G.B. Cooley employee, Anissa Payne, is consistent with Widmer's affidavit. First, Caldwell confirmed in her deposition that Barfield approved J.W.'s transfer.

Second, Fields confirmed Widmer's statements in her affidavit. At her deposition, Fields was read the first full paragraph on page six of Widmer's affidavit, including the statement that Widmer was told by one of J.W.'s QMRPs that "Barfield was fully aware of the [Interdisciplinary Team's] concerns involving J.W., and yet Barfield continued to refuse to allow J.W. to be moved back to . . . campus." Fields admitted that she was the QMRP identified in the paragraph and that Widmer's statements in the affidavit were "pretty much" her recollection.

Third, Anissa Payne ("Payne"), a psychological associate at G.B. Cooley, verified that she provided the information resulting in the statements contained in the second full paragraph of Widmer's affidavit on page six. In that paragraph, Widmer refers to an "interview with an employee of the Psychology Department." Payne verified that she was the employee of the Psychology Department and that she told Widmer that she "did not understand why Barfield refused to move J.W. back to campus. Barfield had knowledge of the incidents that occurred regarding J.W., and had knowledge of the opinion of J.W.'s treatment team. Barfield also knew that J.W. did not adapt to his new less restrictive environment, which was confirmed by his behavior as evidenced by all the incident reports."

In contrast, there is no evidence Widmer knew or had been told that Barfield believed J.W. was receiving one-on-one supervision. Barfield relies on Exhibit 11, the Management Team Meeting minutes from November 25, 2003, and Exhibit 12, the Management Team Meeting

12

minutes from December 2, 2003. However, there is no evidence that Widmer reviewed these documents. Barfield's counsel never questioned Widmer about these exhibits. Although she offered to be re-deposed on some documentation, Barfield's counsel did not do so. Even if Widmer had received and reviewed the documents, Defendants point out the language of the minutes is ambiguous and does not necessarily lead to the conclusion that Barfield believed J.W. was receiving one-on-one supervision.

In supplemental briefing, the parties dispute what Widmer should or should not have discovered prior to her preparation of the arrest warrant and what factual conclusions Widmer should or should not have reached based on the available documents and witnesses. Barfield also focuses on the fact that the District Attorney declined to prosecute her after hiring its own investigator.

As the Supreme Court has observed: "The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted-indeed, for every suspect released." Baker v. McCollan, 443 U.S. 137, 145 (1979).[7] Before an illegal arrest or detention can "take on constitutional dimensions" and constitute a violation of § 1983 tort, the Fifth Circuit requires "proof that the official's actions went beyond mere negligence." Sanchez, 139 F.3d at 469 (citing Sanders v. English, 950 F.2d 1152, 1159 (5th Cir. 1992)).

Based on the information obtained in Widmer's investigation, the Court concludes that Widmer was reasonable in her belief that Barfield had committed the crime charged: cruelty to the

---

[7]Baker involved a case of mistaken identity where an individual was held for three days on the basis of a facially valid search warrant. See 443 U.S. at 143-45. It is not factually similar to the case at hand, and the Court cites it only for the general constitutional principles discussed.

13

infirm. Even if Widmer was mistaken, her actions do not amount to a constitutional deprivation. If this Court were to excise the two statements to which Barfield initially objected (that Barfield "coordinated" and "finalized" J.W.'s transfer), the affidavit still contains sufficient facts to support a probable cause determination under the broad language of the statute in question. See Franks v. Delaware, 438 U.S. 154, 171 (1978) ("[W]hen material that is the subject of the alleged falsity or reckless disregard is set to one side, [and] there remains sufficient content in the warrant affidavit to support a finding of probable cause[,]" then the warrant is valid; "[n]egligent or innocent mistakes do not violate the Fourth Amendment.").

Probable cause is not negated in this case by Widmer's alleged failure to obtain and provide exculpatory evidence. The Court cannot conclude based on the direct or indirect evidence that the facts allegedly omitted from Widmer's affidavit were "clearly critical to a finding of probable cause," so that "recklessness may be inferred from proof of the omission itself." United States v. Martin, 615 F.2d 318, 329 (5th Cir. 1980). Under either of Barfield's theories, and viewing the facts in the light most favorable to her, the facts are insufficient to show that Barfield's Fourth Amendment rights were violated, and Widmer is entitled to summary judgment.

Widmer properly presented her affidavit to an independent judge, who also concluded that there was probable cause for Barfield's arrest. The evidence relied upon by Barfield is insufficient to show that Widmer's statements in her affidavit were inaccurate or that she maliciously or recklessly withheld exculpatory information from Judge Sharp. Widmer's affidavit in support of the arrest warrant shows that her statements were based upon the DHH report signed by Barfield and witness interviews with J.W.'s aunt and current and former G.B. Cooley employees. In their depositions, employees Caldwell, Fields, and Payne confirmed the accuracy of the information.

While Barfield argues that there were exculpatory documents which were reviewed by Widmer, and employees with exculpatory information whom Widmer failed to interview, there is no evidence in the record that Widmer acted maliciously or recklessly. Under these circumstances, Widmer is also entitled to qualified immunity by the break in the causal chain doctrine. See Kugle v. Shields, 62 F.3d 395, (5th Cir. 1995) ("[O]fficers who maliciously or reckless[ly] misrepresent or omit material information . . . are not shielded from liability" under the break in the causal chain doctrine, but where plaintiff's own description of the officer's conduct amounted to "no more than negligence," the officer was entitled to qualified immunity); cf. Hale v. Fish, 899 F.2d 390 (5th Cir.1990) (denying qualified immunity where affidavit submitted to magistrate contained material misstatements and omission of exculpatory evidence of such character that no reasonable officer would have submitted it).

Accordingly, Defendants' Motion for Summary Judgment on Barfield's § 1983 claim against Widmer is GRANTED, and this claim is DISMISSED WITH PREJUDICE.[8]

### C. Section 1983 Claims against Defendants for Injunctive and Declaratory Relief

Barfield has also raised claims for injunctive and declaratory relief under § 1983 against Widmer and Foti in their official capacities and against the LDOJ.[9] She seeks to "permanently

---

[8]Having determined that Barfield failed to raise a genuine issue of material fact on whether she suffered a constitutional deprivation, the Court need not reach the second part of the qualified immunity test. See Saucier, 533 U.S. at 201.

[9]Suits against state officials in their official capacity are considered to be suits against the individual's office, and so are usually barred under the Eleventh Amendment, just as suits against the state itself. See Will v. Michigan Dept. of State Police, 491 U.S. 58, 70-71. However, the Eleventh Amendment does not bar suits for prospective injunctive or declaratory relief against a state official in his official capacity acting in violation of federal law. See Ex Parte Young, 28 S.Ct. 441, 449-50 (1908); Aguilar v. Tex. Dep't of Criminal Justice, 160 F.3d 1052, 1054 (5th Cir. 1998). Further, in this case, the State Defendants have waived their sovereign immunity by

15

enjoin the defendants from harassment and defamations . . . ." [Doc. No. 1]. She also seeks injunctive relief in the form of a court order to expunge her criminal records relating to this matter. If her record is not completely expunged, Barfield seeks additional damages.

Defendants contend that they are entitled to summary judgment because Barfield has resigned her position with G.B. Cooley and Defendants' actions have no "reasonable likelihood" of repetition.

Jurisdiction over a plaintiff's claims for future relief is appropriate only if a reasonable likelihood exists that the plaintiff will again be subjected to the allegedly unconstitutional actions. Honig v. Doe, 484 U.S. 305, 317-18 (1988); Marden v. International Ass'n of Machinists and Aerospace Workers, 576 F.2d 576, 582 (5th Cir.1978).

The Court must examine the nature of the claims for injunctive and declaratory relief against Widmer, LDOJ, and Foti. Barfield seeks to prevent Defendants from harassing or defaming her and seeks the expungement of her criminal record. None of the relief requested is tied to her employment. Her resignation does not resolve the issue.

However, the issue is resolved by the Court's ruling on Barfield's individual capacity claim against Widmer. Barfield's only basis to request relief from harassment and the expungement of her criminal record is her individual § 1983 claim against Widmer. Because the Court has determined that Barfield has suffered no constitutional deprivation, she has no claim for

---

removing this case to federal court. See Lapides v. Bd. of Regents of the Univ. Sys. of Ga., 535 U.S. 613, 620 (2002); see also Spooner v. Jackson, No. 06-31021, 2007 WL 3144707 (5th Cir. Oct. 24, 2007) (In § 1983 action for damages and injunctive relief, the State of Louisiana and Louisiana Department of Public Safety and Corrections waived sovereign immunity under Eleventh Amendment when they removed the action to federal court). As a point of fact, however, Barfield need only have brought suit against Foti in his official capacity, as the claim against him is a claim against the LDOJ and, in turn, the State.

16

declaratory or injunctive relief against Defendants either. Defendants' Motion for Summary Judgment on the declaratory and injunctive relief claims against Defendants is GRANTED, and these claims are DISMISSED WITH PREJUDICE.

## III. FALSE IMPRISONMENT AND REMAINING STATE LAW CLAIMS

Defendants have also moved for summary judgment on Barfield's state law claim of false imprisonment. Having resolved all federal claims in this matter, the Court declines to exercise supplemental jurisdiction over Barfield's state law claims. Accordingly, Defendants' Motion for Summary Judgment on Barfield's claim of false imprisonment is DENIED.[10]

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 17] is GRANTED IN PART and DENIED IN PART. The motion is GRANTED as to Barfield's constitutional claims under 42 U.S.C. § 1983, and those claims are DISMISSED WITH PREJUDICE. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. Therefore, the motion is DENIED as to Plaintiff's false imprisonment claim. The Court REMANDS this matter to the Fourth Judicial District Court, Parish of Ouachita, State of Louisiana, for all further proceedings.

MONROE, LOUISIANA this \_\_\_25\_\_\_ day of \_\_\_February\_\_\_, 2008.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE

---

[10] The Court expresses no opinion on the validity of the grounds for summary judgment on Barfield's false imprisonment claim. Defendants may re-urge the motion in state court if the state court permits.

17